AMERICAN BELL TEL. CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. May 18, 1895.)

No. 121.

1. PATENTS—DELAY IN PATENT OFFICE—LACHES OF APPLICANT—MOTIVE.
If an applicant is under no legal obligation to prevent delays arising from the acts or omissions of the patent office officials, there is no rule of law by which it can be said that, because he may have received an incidental benefit therefrom in the prolongation of his monopoly, his purpose in not more vigorously pressing his application was unlawful. One's motives will not make wrongful an act which is not in itself wrongful.

2. SAME—DUTY OF APPLICANT—DILIGENCE.
There is no rule of diligence requiring an applicant, on pain of forfeiting his rights, to do, in the interest of the public, all the things which he has a right to do, in his own interest, for the purpose of pressing his application to a speedy issue.

3. SAME—BILL TO CANCEL PATENT.
Upon a bill to cancel a patent on the ground that the patentee acquiesced in delays of the patent office whereby his monopoly was, in effect, prolonged, it is not for the court to say, under the circumstances of this case, that he was not entitled to use his own judgment in respect to what unofficial methods he might take, or the persistency of his representations to the public officials for the purpose of speeding his application.

4. SAME—UNDERSTANDING WITH OFFICIALS OF PATENT OFFICE.
The existence of an understanding between the patent office officials and an applicant that further action should abide the result of certain litigation involving the applicant's rights is no ground for forfeiting a patent subsequently granted, though the delay in effect operated to prolong the patentee's monopoly, where the understanding was the result of the honest and independent judgment of both parties that this course was, on the whole, the best, and consisted in nothing more than a mere interchange of these views.

5. SAME—ERROR OF JUDGMENT BY COMMISSIONER.
An error of judgment on the part of the commissioner in delaying action upon an application pending certain litigation which involved the applicant's rights, and the acquiescence of the applicant in such delay, is no ground for forfeiting the patent subsequently issued.

6. SAME—BILL TO CANCEL PATENT—BURDEN OF PROOF.
Where a bill was brought by the United States to cancel a patent, on the ground of laches of the applicant in pressing his application to a final

issue, and it was contended that, by reason of the special circumstances of the case, he was under an extraordinary duty to the public to exercise the greatest possible diligence to move the patent office officials to speedy action, *held* that, assuming the existence of such an obligation, the burden rested upon the United States of proving that under some practical method or methods, not resorted to by the patentee, the action of the patent office would have been hastened.

7. SAME—CONSTRUCTIVE FRAUD.
    A patent should not be canceled merely upon the ground of imputed or legal fraud arising from delay of the patent office, acquiesced in by the applicant, where there was no deceit, collusion, or corruption.

8. SAME—AUTHORITY OF COMMISSIONER—TWO PATENTS TO SAME PERSON FOR SAME INVENTION.
    The issuance of a second patent to the same person for the same invention, under such circumstances that it is not clearly manifest that the inventions are the same, and that there might be a reasonable difference of opinion on the question of identity, does not involve such an excess of power on the part of the commissioner as will justify a court of equity in canceling the second patent, especially in view of Rev. St. §§ 4893, 4911.

9. SAME—TELEPHONES.
    The Berliner patent, No. 463,569, for a combined telegraph and telephone, *held*, in a suit to cancel the same, not void on the ground of fraud, mistake, or laches in pressing the application to final decision in the patent office.

10. APPEAL—ALLOWANCE OF AMENDMENTS TO PLEADINGS.
    On appeal by complainant from a decree rendered against him after final hearing in equity, the appellate court, on affirming, will not ordinarily reserve leave for an amendment of the bill which would require the taking of new evidence.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

This was a bill by the United States against the American Bell Telephone Company and Emile Berliner to cancel patent No. 463,569, for combined telegraph and telephone. The circuit court entered a decree for the cancellation of the patent (65 Fed. 86), and the respondents appeal.

William G. Russell, James J. Storrow, and Frederick P. Fish (William W. Swan and William K. Richardson, on the brief), for appellants.

Causten Browne and Robert S. Taylor, for the United States.

Before COLT and PUTNAM, Circuit Judges, and NELSON, District Judge.

PUTNAM, Circuit Judge. This is a bill in equity, filed February 9, 1893, signed in behalf of the United States by its attorney general, against the American Bell Telephone Company and Emile Berliner, containing a prayer in the alternative touching patent issued November 17, 1891, numbered 463,569, to the American Bell Telephone Company, as assignee of Berliner. The prayer is that the patent be in all things recalled, repealed, and decreed absolutely null, but that, if the patent is not deserving to be wholly repealed, but is repealable in part, a decree be made repealing only such parts as the court shall deem to be repealable. As to the latter part of this alternative prayer for relief the court has heard nothing, and there is no occasion to consider it.

The bill contains enough on its face and in its frame, and in its signature by the attorney general, to bring it within U. S. v. American Bell Tel. Co., 128 U. S. 315, 9 Sup. Ct. 90. But in the development of the proofs all allegations of affirmative or positive fraud dropped out; so U. S. v. American Bell Tel. Co. fails to reach the merits of this cause.

Berliner's original application was filed June 4, 1877, and patent 463,569 was issued more than 14 years thereafter. This patent is sufficiently described for the purposes of this case by saying in a general way that it covers the microphone. In addition to this, the American Bell Telephone Company, as assignee of Berliner, holds, or held, a patent issued to Berliner, November 2, 1880, numbered 233,969. It is represented that the patent of November 2, 1880, was a divisional one, growing out of the same original application which supports patent 463,569. It is also represented that this patent covers the invention described and claimed in patent 463,569, under such circumstances that the latter comes within Miller v. Manufacturing Co., 151 U. S. 186, 14 Sup. Ct. 310.

The pith of the case, as stated briefly by the counsel for the United States, is (1) that patent 463,569 is void for illegal delay in its issue, and (2) that it is also void on the ground that the prior patent, 233,969, "was granted upon the same application to the same applicant for the same invention." Each proposition will be stated hereafter more fully, and in the precise form in which it came to the court. Berliner, having no interest, need not be further noticed by us.

As to the first ground of proceeding, the case is found in the following extracts from the bill:

"On June 4, 1877, said Emile Berliner * * * filed in the patent office of the United States an application, executed in due form, asking a grant of letters patent for certain improvements in combined telegraph and telephone. * * * Upon said application such proceedings were held in the patent office that on November 17, 1891, a patent, numbered 463,569, was issued to the respondent the American Bell Telephone Company, as assignee of said Emile Berliner, * * * the title to which patent remains and is now in said American Bell Telephone Company, as owner of the entire interest therein. * * * And your orator alleges that said patent was unlawfully obtained by said respondent the American Bell Telephone Company, and unlawfully issued by the commissioner of patents, and is an illegal grant, and ought of right to be annulled, for reasons which are hereinafter set forth; and as an act of duty and justice towards the citizens of the United States, all whose rights and privileges are unlawfully and unjustly abridged by said patent, your orator brings this bill for the repeal thereof. * * * Your orator shows further on information and belief that after the filing of the application aforesaid by said Berliner, and at some time prior to October 23, 1878, said Berliner sold the invention described in said application and his right to a patent therefor to one of the predecessors and grantors of the respondent company aforesaid, viz. either to said Bell Telephone Company or said National Bell Telephone Company (corporations organized under the laws of Massachusetts), or both, the precise fact in this regard being unknown to your orator. * * * And your orator avers further that the broad claims of said patent 463,569, cover in their scope every form of constant contact telephonic transmitter which it is possible to make. * * * And pointing out the circumstance * * * that from the time of acquiring title to the invention of said Berliner, as aforesaid, until the issue of said patent 463,569, said respondent company and its predecessor or predecessors had control of said application of said Berliner, and at the same time owned the inventions and patents of Blake, Berliner,

and others, under which it was enjoying a monopoly of the use of the broad invention of the constant contact telephonic transmitter, your orator avers that there rested upon said respondent company an extraordinary duty to speed said application by every means known to the law, and that if, by any act or omission of said company, the issue of said patent 463,569 was to any extent delayed beyond the date when it might have been issued (if it could of right be issued at all), such delay ought to and does invalidate said patent. And your orator expressly charges that, so far from performing that duty, said respondent company, by a course of conduct which is hereinafter in part set forth in detail, designedly, and with intent thereby to prolong its monopoly aforesaid, delayed and prolonged the pendency of said application for more than thirteen years after it obtained control of the same as aforesaid."

Then follow various allegations stating in detail the delay in the progress of the application before June 9, 1882. These we omit, because the counsel for the United States now admit that no point is made for that period.

Then come the following:

"Your orator shows further that it is advised that it is claimed and pretended by said respondent company that from and after about June 9, 1882, the progress of said application was delayed in the patent office by the pendency of other applications which interfered or might have interfered with the application of said Berliner, and that for that reason it was impossible for it to procure the issue of said patent 463,569 at an earlier date than that on which the same was issued, which your orator denies, however, to be true; and your orator in that behalf avers the truth to be, on information and belief, that, while after the year 1882 said application was embraced in one other interference, it need not have delayed the progress of said application to any substantial extent, because it was upon a minor feature of invention, which could have been separated by division from said broad claims of invention as other minor matters were; and, further, that it did in fact occupy in the aggregate only three months out of the nine years which elapsed after said last-mentioned date. And, as to other pending applications which might or could have interfered with said application of said Berliner, your orator avers, on information and belief, that there were only two, of which one was an application by Thomas A. Edison, which was owned and controlled by said respondent company itself, and the other an application filed by one Daniel Drawbaugh, July 26, 1880. And your orator avers on information and belief that said application of said Drawbaugh was never, prior to the issue of said patent 463,569, completed or presented for allowance by the patent office in such form as to be allowable, independently of any interference with said application of said Berliner which could or might have been found to exist; and if, as said respondent company claims and pretends, the examiners of the patent office kept said patent 463,569 suspended from issue for nine years, waiting to see whether said Drawbaugh would present his application in such form as to warrant a declaration of interference between it and said application of said Berliner, such procedure on their part was contrary to law and the duty imposed on them, and it was within the power of the respondent company, by timely and proper assertion of its rights before the patent office, to terminate such unlawful delay, and secure final action on said application. * * * But your orator charges that said respondent company, being interested in prolonging such delay as aforesaid, countenanced and acquiesced in the inaction of the examiners of the patent office, and, though it made at long intervals some pretenses on the record of a desire that said application should be taken up and acted upon, it did not during all that time bring the subject of the extraordinary delay in said proceedings to the knowledge of the commissioner of patents, or in any way challenge the right of the examiner to keep said application waiting year after year for a possible interference with some other application, or take any step whatever to promote the advance of said application, all of which course of conduct amounted, as your orator avers, to a consent and agreement on the part of said respondent company to the unlawful and unauthorized postponement of action on said appli-

cation by the examiners of the patent office, and affects the said company with the same responsibility for said delay which would attach to it if the same had been by its express act instead of its express sufferance. * * * Wherefore your orator says the wrong and injury perpetrated upon the people of the United States by the issue of said patent 463,569, 14 years after the application therefor, has come about by the design, machination, and connivance of said respondent company, and by means of .the abuse by it of the generosity and liberality of the government of the United States and the patent laws, and in justice and equity said company ought not to derive or receive any profit or advantage therefrom."

There is much additional matter bearing on these last propositions, but we have given enough to show this part of the case. There are also allegations that, prior to acquiring the invention of Berliner, the defendant corporation became the owner of the patent numbered 174,465, issued March 7, 1876, to Alexander Graham Bell, covering the transmission of sound by means of an undulatory current of electricity, and the same considered in The Telephone Cases, 126 U. S. 1, 8 Sup. Ct. 778; that patent 463,569, if valid, will continue without substantial diminution, during the full term thereof, the same close monopoly of the art of telephoning enjoyed under the patent to Bell; and that this is against justice and equity, and contrary to the plain spirit and intent of the patent laws. These are pointed out as circumstances on which the bill bases an alleged extraordinary duty of the defendant corporation to speed the Berliner application. If it were necessary to examine the motives of the American Bell Telephone Company, as bearing on a question of either positive or implied fraud, or on a question whether it did in fact speed the application of Berliner, and its purposes in relation thereto, these facts might become relevant as evidence, as might also the alleged great value of the microphone. But it is clear that all such allegations are irrelevant to the bill itself. So far as the law is concerned, the patent in suit is to be tested independently of the Bell patent. There can be but one law touching alleged delays in the progress of an application through the patent office, and touching the duty of applicants with reference thereto, whether the invention was from the outset seen to be valuable, or only afterwards proves to be so, or always remains of little account. To deny this is to deny that the laws are equal, and would furnish a standard for the determination of the rights of patentees too fickle and imaginative to form a proper basis for the use of a court of law. Therefore, we have not set out these allegations as proper portions of the bill, and do not deem it necessary to make further explanations in reference to them.

The following extracts from the answer of the American Bell Telephone Company sufficiently illustrate its defense on this point:

"In and by that patent, the United States, plaintiff herein, by its secretary of the interior, its commissioner of patents, and its various other officers in its patent office, by it duly appointed, employed, and empowered to make the grant, and to make, conduct, and supervise the examination and other proceedings which preceded it, announced and declared that it had found and adjudged that the said Berliner had duly presented a petition praying for the grant of letters patent for the invention and improvement in said patent, and its said specification described, had assigned the same to this respondent; and that he and this respondent had complied with the various requirements

of law in such case made and provided; and that, upon due examination made, the United States had adjudged said grantee to be justly entitled to said patent under the law. * * * The United States, plaintiff herein, had in fact so adjudged by its duly-authorized officers, after due, full, elaborate, and complete examination touching each and all such matters. Each such examination and decision was made by the officers whom the plaintiff held out as having, and who actually had, jurisdiction to make that examination, and to determine, regulate, supervise, and control the manner and form of the proceedings, and the whole conduct thereof. Those examinations and decisions were made with a full knowledge of all material facts. They included an actual consideration of all the objections set forth in said bill, and of the truth or falsity and legal effect of every matter therein alleged as matter of fact; and the patent was issued in consequence and as the result of conclusions intelligently and deliberately reached upon such examination and adjudication. Its grant was not in any degree the consequence or result of any fraud, accident, or mistake, as in said bill most falsely is alleged, or purports to be alleged, nor was there any violation of law or error in the proceedings upon which it was granted. This respondent and said Berliner, in the initiation and in the prosecution of the application which resulted in said patent, and in all the proceedings with relation thereto, in all respects conformed to and complied with the various requirements of law in such case made and provided; did nothing which in law, justice, or good conscience they ought not to have done; and omitted nothing which in law, justice, or good conscience they ought to have done. All their respective statements and representations were intended by them, and were believed by them, respectively, to express the truth. They disclosed and communicated to the patent office everything which it was their duty to disclose or communicate. They did not conceal nor attempt to conceal from any official of the patent office anything which they were bound to communicate, or which they believed that it was material for him to know. They did not deceive or mislead any such official, nor did they attempt nor intend so to do. They did not take advantage of any ignorance of any such official, nor attempt to do so; nor did they profit by any such ignorance or seek to. They did not commit any abuse of process, proceedings, or forms of law, nor contrive, attempt, nor intend so to do, and were not guilty of any fraud, concealment, imposition, or false suggestion whatever. They did not practice, nor attempt to practice, any fraud, deceit, suppression, or subterfuge, but in all respects conformed to law and to the highest good faith and honesty. * * * Whether Berliner's application was pending for a longer time than was necessary or proper this respondent is not sufficiently informed to fully admit or deny, and therefore requires the plaintiff to produce proof thereof, if material. But this respondent did not designedly, with intent to postpone the expiration of said patent and its rights thereunder, delay or prolong the pendency of the application, nor do any act tending to that end. Neither the pendency nor the progress of the application nor the issue of the patent in suit were delayed by any act, omission, or slowness of either respondent. It never omitted to take promptly every action which it was incumbent on it to take, or the taking of which it believed would hasten that issue. It never failed to prosecute the same promptly, and it used every means known to the law to speed the application, including applications to the commissioner in person as often as they seemed likely to result in speeding the case. It avers that the slowness alleged in the bill was the act of the plaintiff itself. Neither respondent in any way contributed thereto by act or by omission. Neither such delay, nor any action, inaction, or slowness which caused it or contributed to it, was in any way aided, promoted, due to, desired, intended, designed, contrived, countenanced, acquiesced in, or connived at, by either of the respondents; and neither of them is responsible therefor, nor for the consequences and results thereof."

To the answer replication was duly filed and proofs taken. The cause was heard in the circuit court, and there decided in favor of the United States, on each of the points we have briefly stated as being issues in the cause, from which appeal was duly taken to this court.

The case has been so thoroughly argued here on either side that the court has found little difficulty in apprehending it. We deem it prudent to refrain from determining ultimately any questions of fact, except so far as we find it necessary so to do in order to apply the appropriate rules of law. The bill alleges, in portions of it which we have not cited, that Berliner's application was abandoned at one stage of the proceedings. In order to correctly estimate the issue under discussion, it is necessary to note that this is not now relied on. The United States have somewhat variously stated their position, and our first duty is to understand precisely what it is. In the very lucid and careful opinion of the learned judge who heard this case in the circuit court, one statement of it is repeated as follows:

"The proposition is that the Bell Company intentionally delayed the prosecution of the Berliner application, and the issue of the Berliner patent, for the purpose and with the result of prolonging their control of the art of telephony, which would cease with the expiration of the Bell patent in 1893; and that they did this by submitting to delays on the part of the officers of the patent office, which delays they, the Bell Company, had it in their power to prevent, and refrained from preventing, for an unlawful purpose. This conduct is alleged to constitute a fraud practiced upon the public through the commissioner of patents and his assistants; and it is claimed that the patent so obtained by such fraud may be and should be annulled by the decree of the court, on the authority of U. S. v. American Bell Tel. Co., 128 U. S. 315 [9 Sup. Ct. 90], because there is no substantial difference between a fraud practiced upon the commissioner as an agent of the public and a fraud practiced upon the public with the commissioner's connivance or acquiescence."

This is far from precise. It uses the words "intentionally delayed," while it is necessarily conceded that there is no evidence to support that expression in its natural sense, and that the case comes down to a claim that the American Bell Telephone Company submitted to delays which it was in its power to prevent. It continues that the defendant corporation refrained from prevention for an unlawful purpose. The "unlawful purpose" is understood to mean an expectation that its monopoly would be extended through the delays on the part of the patent office. This, in some aspects, it might well regard as advantageous; but to undertake to lay down a rule of law or of fact that acquiescence in the delay of a public official who is bound to perform a certain act involves an unlawful purpose because it may result to the advantage of the applicant omits an important element. If the applicant is under no obligation touching the delay, there is no rule of law by which it can be said that, because he may receive an incidental benefit therefrom, his purpose in relation thereto is unlawful. A man's motives will not make wrongful an act which, in itself, is not wrongful. This came directly in issue, and was so given by Chief Justice Jervis, in Heald v. Carey, 11 C. B. 977, 993; but it is not necessary to cite authorities to this proposition.

This citation further states that there is no substantial difference between a fraud practiced upon a commissioner which is an injury to the public and one practiced on the public with the commissioner's connivance and acquiescence. This is probably a

true statement of the law, because either hypothesis involves positive and affirmative fraud of a public character; but of this there is no claim whatever in the case at bar as it now stands. We must therefore look somewhere else for an accurate statement of the position of the United States. At the hearing at bar the propositions were that the American Bell Telephone Company owed the public some duty in the matter under consideration; that that duty is to be sought in the principle of legal ethics that every man is bound to enjoy his own in such a manner as not to interfere with a like enjoyment of their own by others; that if the exercise of the rights of the American Bell Telephone Company under the Berliner application was liable to work injury to the public, in a way foreseeable by the company, it was bound to take notice of that fact, and conduct its proceedings in such a manner as to avoid that injury, if possible; that, if this situation imposed any duty on the American Bell Telephone Company towards the public, it was a duty commensurate with the interests involved; and that no doctrine of reasonable diligence will reach the case unless reasonable diligence is held to be the utmost diligence; and that it owed the public an extraordinary duty in the matter, which could be discharged only by the greatest possible diligence in the prosecution of its application. It was further claimed that the delays set up in the bill were unwarrantable and illegal; that the attitude of the American Bell Telephone Company towards them was not only one of consent, but of interested consent, of acquiescence, of guilty connivance; that the commissioner was betraying his trust in permitting these delays; that it knew this, and knew the practical effect of what he was doing; and that it was its duty to stir the commissioner to action, instead of refraining from so doing. It was further said that, if the American Bell Telephone Company had bribed the commissioner for holding Berliner's application from year to year for the purpose of prolonging its monopoly, this would plainly be a fraud on the public, through the commissioner; but that to reach the same result by an intentional reliance on his ignorance, incapacity, and neglect of duty, instead of his cupidity, and by conduct in keeping with such reliance, the same injury results to the public, with only the degree less of moral heinousness of behavior on the part of the applicant. We ought to say that all these epithets charging the commissioner or any other officer of the patent office with any conscious violation or neglect of duty, or ignorance and incapacity, are not sufficiently supported by the proofs in the case, unless it can be claimed that they constitute the language which the law applies in consequence of delays which possibly might have been prevented by the public officials. The United States having thus stated its position, we do not find ourselves required to recite the details of the proofs. It is enough to say that the case shows that all the allegations in the answer which we have quoted are sustained, except only that we do not deem it necessary for the purposes of this case to determine fully the condition of the proofs on the proposition that there rested on the American Bell Telephone Company an extraordinary duty to speed its application by every

means known to the law, as alleged in the bill, or to exercise the greatest possible diligence, as claimed at the bar.

During the progress of the arguments, the court anxiously looked for practical illustrations of what was meant by the high degree of diligence referred to, what practically could be done to satisfy its demands, and wherein, if accepted as necessary to relieve the applicant from the charge of a course of conduct unlawful or by implication fraudulent, it differed in its practical requirements from what was in fact done. The court failed to receive light in this direction; and it regards it as an answer to the proposition of the United States on this part of the case that what it did obtain was a mass of theoretical propositions, which, if applied practically, might or might not have involved the case, in its progress through the patent office, in greater complications and difficulties than those which did in truth surround it. In other words, so far as the proofs go, the course of the application was in accordance with the usages of that office, and was such as the officials there, acting in good faith and according to their practical experience, determined at the time to be on the whole the best. What would have been the practical result of the theoretical courses suggested, with an application around which centered so much powerful hostility as gathered about this one, it is impossible to ascertain by any methods of determination given to the courts. If, instead of suggesting theories as to what might have been done, the United States could have pointed out among the usages of the patent office an existing pathway other than that which was adopted, we would have some rule by which to estimate what could have been done in the exercise of extraordinary diligence other than was done.

One proposition of the United States, illustrating generally what they say might have been done, we give in the exact terms stated to us at the bar:

"The duty of the Bell Company was to get its patent with the least possible delay by the exercise of all its legal rights. Whatever it had a right to do to expedite an application in its own interest it was in this case bound to do in the public interest. If a situation arose in which the commissioner was not doing his duty, and in which it would have had a right to challenge his conduct in its own interest, it was its duty to challenge his conduct in the public interest. Its submission in silence to delay directed by the commissioner in violation of his duty was a failure in the discharge of its duty."

In its own interest, the American Bell Telephone Company had a right to go to congress for legislation touching the general course of proceedings in the patent office, as did the commissioner himself in 1889. It might have applied for the removal of subordinates for the purpose of substituting others who would attempt a more radical course of proceedings. It might have applied for the removal of the commissioner himself, and the appointment of a successor who would have turned his energies more in the direction of forwarding the application under discussion. It might have applied to the commissioner for a general revision of the rules of practice of the patent office. The imagination can hardly put a limit to the things it had a right to do. To say, therefore, that it was bound to do in the public interest all that it had right to do in its

own, and that, if it did not do this, it should pay the penalty of a forfeiture of an invention said to be extremely valuable, is a proposition so unreasonable that the mere statement of it by the United States seems to confess the weakness of their case.

Another suggestion of a general character in this same direction was made by the United States as follows:

"The officials of the patent office were guilty of gross dereliction of duty in their treatment of the Berliner application, but there is no reason to believe that anything would have been necessary to secure prompt and proper action by them except a fair, candid, full, strong, and persistent presentation of the facts by the Bell Company, with reasonably ingenious suggestions from it of ways of meeting the difficulties which were encountered in the progress of the application."

This is a merely negative proposition so far as it attempts to reach the defendant corporation without specification, while the case requires an affirmative one with specifications and proofs. But the proposition is that there was on the part of these officials a gross dereliction of duty. Indeed, in the presentation of the case of the United States we have heard very much in censure of the public officials, clothed in the strongest epithets, of which we have already given some instances. We are compelled to say that, if this record suggests any dereliction of official duty, it was in the form of a continued hostility to the American Bell Telephone Company, and of an indisposition to grant the application for the Berliner microphone, with a concurrent disposition to nurse and favor the Drawbaugh application, either for its own direct advantage, or for the purpose of defeating inventions controlled by the defendant corporation. Notwithstanding, as we have already said, the proofs do not convict the officials, they show enough to have warranted the American Bell Telephone Company in guarding itself against the possibility of such a disposition during the nine years between June 9, 1882, and the issuing of the patent now in dispute. Under these circumstances, and after the American Bell Telephone Company and its solicitors had performed the customary duties with reference to the forwarding of its application, including all those things required by statute or by the patent office, the prompt performance of all which is conceded by the United States, it is not for a court of law to say that that corporation, as to all the unofficial methods which it might take, or might omit to take, for the advantage of its case, was not entitled to use its own judgment with reference to the persistency of representation to public officers, especially those whom they had some reason to regard as unfriendly.

But there are more serious difficulties with this proposition. It relates, of course, to unofficial or informal solicitation, including personal interviews. So far as the presentation of the case was concerned, the proofs show that there was at least a reasonable and ordinary amount of this. But what the United States require, as we have already shown, was a high degree of zeal in this direction. Whether, however, the law's measure is that of reasonable diligence or the highest, the courts have no standard by which they can determine what amount of informal solicitation would have

been proper, all the formal channels of communication having been occupied, as they were in this case, or what amount would have been permitted by the public officers concerned; nor is there anything in this record which affords proof to the court that informal solicitations beyond those which were actually used would have been effective. It must be admitted that it is not only necessary for the United States to prove that there was a lack in this direction, but that the lack contributed to the result. The court might guess that additional informal solicitations would have advanced the application, or, perhaps, have retarded it; but there is no proof which enables us to form proper judicial conclusions on this point, and probably, from the nature of the thing, there could be none. If the record showed that the American Bell Telephone Company had failed to make the usual communications, whether oral or written, there might be something which the law could take hold of; but, as the proofs stand, the fact is otherwise.

The United States urge strenuously Machine Co. v. Keith, 101 U. S. 479, 485. This case related to the obligations of a patentee as towards alleged infringers, and not towards the United States or the public at large. It, moreover, differed essentially from the case at bar, because here the United States seeks to establish a rule, heretofore unknown in the general administration of the law, by which a person who has acquired a legal title is sought to be deprived of it on the ground of laches; while Machine Co. v. Keith related strictly to a question of abandonment, not as a conclusion of law, but as a matter of fact. But in Smith v. Vulcanite Co., 93 U. S. 486, where a similar claim of abandonment was set up, it appeared that the caveat was filed in May, 1852. The application for the patent was made in 1855, and was rejected three times, the third time being in 1856. Thus the matter lay until 1864, when a new petition was filed; and the patent was finally granted June 7, 1864, more than 12 years after the caveat was filed, and 9 years after the first application. The question was again purely one of intention, and the circumstances of the delay were met and overcome by the poverty and ill health of the applicant. The court, observing on this case in Machine Co. v. Keith, said, on page 488, that the patentee never relaxed his vigilance, he left nothing undone which he could do, and nobody had been encouraged by any action of his to appropriate his invention. His patent was sustained. It is to be borne in mind that, as the statute then stood with reference to each of these cases, the limitations now found in section 4894 of the Revised Statutes did not exist; so that the question stood on the common law. On the whole, in the cases of Smith v. Vulcanite Co. and Machine Co. v. Keith, in each of which the question was one purely of intent, facts of the character raised by the contention of the United States which we are now considering were clearly relevant, and easily and justly weighed and applied; but in the case at bar, where the proposition relates to the alleged legal duty of an inventor, the application of Machine Co. v. Keith, and by consequent necessity of Smith v. Vulcanite Co., would raise a crop of undefinable discriminations, according to the peculiar personal circum-

stances as to financial ability or inability, health or ill health, of different inventors, not recognized by the law wherever a positive duty is imposed. Indeed, the whole tenor of the case of the United States, so far as it is supported by the proofs, has this same aspect, through the appearance of requiring of the defendant corporation a degree of diligence and astuteness apparently greater than that which would be expected from other inventors.

These, we think, are the only general propositions made to us in illustration of the rule of diligence demanded, and we might properly dispose of the case on this general view of its substantial features; but its importance requires us to look at it somewhat closer, and to test it in detail at certain stages. The United States divide the history of this application into three periods: The first from June 4, 1877, to June 9, 1882; the second from June 9, 1882, to March 19, 1888; and the third from March 19, 1888, to November 17, 1891, when the patent issued.

We find it more convenient to discuss the third period in advance of the second. The United States dispose of it very summarily, and the learned judge of the circuit court was of the opinion, as we understand him, that there was no effort, so far as he could see in the evidence, on the part of the respondent corporation, to prevent the delay covering this period. One proposition of the United States was as follows:

"With the decision of the supreme court in the Drawbaugh Case, the event happened which, by the understanding which had subsisted for six years between the Bell Company, the patent office, and Drawbaugh, was to determine the question of allowance of Berliner's application. The decision was as sweeping and comprehensive as could have been expected. The court held that Drawbaugh's story was, as a whole, a tissue of fraud and falsehood. The Bell Company, assignee of Berliner's invention, and the People's Telephone Company, assignee of Drawbaugh's invention, were parties to the record. If it was possible for the court within the issues to decide the question of priority of invention between Berliner and Drawbaugh, it became res adjudicata by the decree. If it was possible for the opinion of the supreme court to have any persuasive force with the commissioner of patents, that persuasion was overwhelming. * * * As to the third period, the time following the decision of the supreme court (excepting the interval between May 9, 1888, and February 26, 1889, during which time the application was standing upon a rejection by the examiner and appeal to the board), the Bell Company knew that the only obstacle in the way of the issue of the patent was the pendency of Drawbaugh's applications. It knew that the bar of public use against those applications was inseparable, and hence that no interference could ever be declared. It knew that the highest court in the land had decided, in a suit to which both claimants, through their assignees, were parties, that Drawbaugh's claim of prior invention was unfounded. Was there no way in which it could enforce that which it knew, and could so clearly show, to be its right?"

We see no criticism touching the American Bell Telephone Company with reference to this period, except what is suggested in the interrogatory quoted. On the other hand, as we have already remarked, public officials receive the weight of the criticism, the United States having pressed on us the following views:

"No explanation can be given of these shameful proceedings in the patent office that will acquit the commissioner from an imputation of corruption, or an indifference to the rights of the public which would be scarcely less crim-

inal, except that he did not realize what was going on. The application was not before him personally, and it is only charitable to suppose that its existence, the character and scope of its claims, their relation to the art of telephony, and the effect which the delay in the grant of the patent would have in prolonging the monopoly of that art, were never present before his mind together, so as to give him a realizing sense of the gravity of the situation. As for the examiners, that excuse cannot be offered, or any other, unless it be that they had become so much the slaves of routine that they had no conception of duty, except to keep the applications in their hands rolling down ruts which had been worn by custom, and had become oblivious of all considerations of justice and right which exist apart from precedents and rules."

It is also said that a mere suggestion on the record that delay in this application was prolonging the monopoly of the microphone would have commanded instantly the co-operation of every member of the patent office corps in speeding its progress.

We may as well consider at this point, for the whole case, the propositions thus indirectly stated, that the commissioner was not personally advised of the true relations of this application, and that the American Bell Telephone Company was in fault for not bringing them personally to his attention. The record fully contradicts this. It shows beyond question that the Berliner and Edison applications, which went hand in hand, had become so notorious that the knowledge of them permeated the patent office from the head to the foot, and that the contest against them by Drawbaugh was so vigorous that it was impossible that any person, from commissioner to examiners, should not have understood their importance. The record shows by the testimony of four examiners, one assistant examiner, one commissioner, and one assistant commissioner, and by the reports of an additional examiner and five additional commissioners, as well as by three separate decisions of the board of examiners in chief, acting either on the Berliner microphone or Drawbaugh's application, that all these officials and official bodies had personal knowledge of the existence and pith of the controversy, and of the parties to it, and more or less of the details. The testimony cited by the United States touching an alleged agreement to await pending litigation in the suits known as "The Telephone Cases" (126 U. S. 1, 8 Sup. Ct. 778), which will be referred to more at length hereafter, states positively that at the time this alleged arrangement was made, which was in 1882 or 1883, "the whole situation was understood by the commissioner personally." In February, 1889, the commissioner directly interfered in the proceedings, under such circumstances that he could not have failed to appreciate the issues in the case. An examiner testifies that, for certain reasons which he explains, he constantly acquainted the then commissioner personally with all actions of importance which he contemplated, and solicited his views touching them. This commissioner was in office from the spring of 1887 to the spring of 1889. At one point, as already stated, the case shows direct personal interference by the commissioner. A formal request from the examiner to the commissioner for a disposition of the Drawbaugh application, under date of January 19, 1889, bears the following indorsement, under date of February 20, 1889, signed by the com-

missioner personally: "This matter is postponed. If not called up by the commissioner on or before the expiration of six months, the examiner will bring the case to the attention of the commissioner." The paper also bears a further indorsement, made exactly six months and one day subsequent, by the acting commissioner, as follows: "This matter is again postponed until further notice." Another indorsement appears under date of September 30, 1889, also signed by the commissioner: "This matter is postponed to Oct. 22, 1889, when, notice having been given, the order to show cause, dated Jan. 19, 1889, will be heard by the commissioner." That this series of postponements commenced by a personal order of the commissioner appears from the fact shown in the record that the commissioner informed the examiner that the solicitor general, who in this matter was acting as the attorney general of the United States, was conducting a suit against the Bell Telephone Company, being the same as U. S. v. American Bell Tel. Co., 128 U. S. 315, 9 Sup. Ct. 90, already referred to, and desired in the course of that suit to make use of Drawbaugh or some of his witnesses, and that he (the solicitor general) thought it would be prejudicial to his chances of obtaining the testimony desired if the patent office should at the same time prosecute a proceeding against Drawbaugh. This proof, of course, does not legally charge the solicitor general, as it is mere evidence of a conversation as to which he was not a party; but it leaves no doubt that at this point the commissioner took personal responsibility in the matter. The details touching the other postponements covered by the indorsements referred to we have no occasion to investigate. It is plain, therefore, the commissioners were at various crucial points personally acquainted with the magnitude of the controversy, and with some of its details. Knowing its magnitude, they knew, at least in a general way, that detriment to the public interests would come from delay in the progress of the case in the event that it was followed by the issue of a patent. This was all which it was necessary they should know, as it is the pith of the entire complaint of the United States. Having this knowledge, the claim of the United States that the American Bell Telephone Company should have suggested on the record, or anywhere else, that delay in the application was prolonging the monopoly of the microphone, falls, of course, to the ground, unless we accept the extreme proposition that it was the duty of that corporation to keep this fact constantly before the eyes of the commissioner personally.

It is not to be forgotten that among the difficulties which the Bell Telephone Company was forced to face was the fact that its application was twice rejected,—once during the first period named by the United States, and the second, under formidable objections, during the third period. A brief statement of the occurrences during the latter period was specially reported by the examiner to the commissioner under date of October 29, 1891. This report contained the following statement:

"The interfering application, by reason of which this application has been suspended and withheld from issue, contained claims for the same invention

as that herein claimed. It was therefore necessary to declare an interference if the interfering applicant could show that he was entitled to the claims except as regards the question of priority with Berliner. But the claims of the interfering applicant were under rejection for various reasons, and it was necessary that he be given opportunity to overcome the rejection. To this end he prosecuted his application. Finally, my immediate predecessor instituted a public use proceeding under the supervision of the examiner of interferences. This proceeding was sharply contested by the interfering applicant, and resulted against him; my decision based on the findings of the examiner of interferences having been affirmed by the board of examiners in chief, and the decision of the board having been yesterday affirmed by you. This decision removes the only impediment to the allowance of the Berliner application."

The Berliner patent was taken out almost immediately afterwards; that is, November 17, 1891. Subsequently, on December 13, 1892, at the request of the attorney general touching the pending suit, the secretary of the interior obtained a report from the commissioner of patents of the history of the patent. Both the commissioner and the secretary of the interior had before them a brief from the relator at whose suggestion this suit was brought; so that the issues were fully understood by them. The commissioner's report to the secretary of the interior contains an extract from the report of the examiner, to which we have already referred, as follows: "The office delay from October 23, 1883, to November 16, 1888, should not, so far as the records are known to me, have occurred." This examiner was not personally familiar with the unofficial and informal proceedings covering that period. But the report of the commissioner was such that the secretary of the interior answered the attorney general that it was "certainly true that from 1889 the case has been pressed to judgment without any delay that could be avoided." This means undoubtedly, in accordance with the dates given by the examiner, to include the whole of the year 1889, at least so much of it as the officials whose reports we are discussing were in office, which was from the early part of March. While the report of the secretary of the interior cannot be taken formally as governing this court, yet, in view of the facts to which we have referred and of others in the record, we unhesitatingly accept it as our own conclusion. It covers substantially the third period.

This disposes of all questions of diligence so far as this period is concerned, whatever may be the rule. But, for the purpose of further ascertaining in what manner the American Bell Telephone Company could have practically exhibited the degree of diligence required of it by the United States, we inquire, what obligation rested on it with reference to the interference of the solicitor general? He presumably represented the settled policy of the department of justice. In the line of criticism in this case, this supposed interference of the solicitor general has also been severely reprehended; but he is not on trial here, and has not been heard. We are to assume that he was engaged in the honest performance of what was regarded by him as a great public duty, in a legal contest of the gravest character with the American Bell Telephone Company itself, represented here as a wealthy, powerful, and influential antagonist. In reply to a question put from the bench, in what ef-

fective way this corporation could exercise with reference to this particular crisis the degree of diligence required of it by the United States, the answer was, by laying the case in all its relations personally before the solicitor general. The United States seem to assume that the solicitor general, as well as the commissioner, failed to appreciate the grave consequences, as now described, likely to arise from delay in acting on the application touching the Berliner microphone, and that it was the special duty of the defendant corporation to set him right. But, looking at the matter from the position of those accustomed to engage in large and important litigation, we cannot doubt that the counsel for the United States would be forced on reconsideration to agree with the court that, at the crisis to which we refer, any approaches by the American Bell Telephone Company to the solicitor general, having regard to anything which would weaken or hamper the prosecution of the then suit, would have been regarded with suspicion, and would have been entirely beyond and outside of the efforts reasonably expected from solicitors and counsel with reference to any pending hostile proceedings. Like every other proposition in the case having in view an explanation of the practical methods in which the American Bell Telephone Company could have exercised at various stages the extreme degree of diligence asked of it by the United States, this one fails to bear out any test whatsoever.

But the United States say that, during this period to which we are now referring, the commissioner made a ruling which, if availed of by the American Bell Telephone Company, would have promptly solved the pending difficulties. We refer to it, not for the purpose of going over the conclusions we have already stated on this part of the case, but as a further illustration of the ineffectual attempt of the United States to suggest practical methods available to that corporation. The United States point out that in May, 1888, the commissioner ruled that, notwithstanding the pendency of a probable interference or of an interference actually declared, the commissioner might, under the circumstances described in that decision, direct the issue of one of the patents involved. This was so clearly contrary to the long-settled practice of the patent office, and would so directly tend to involve the office in the embarrassing necessity, from time to time, of issuing two patents for the same invention to hostile applicants, that we find no mention of it further in the case, and no suggestion that any of the officials of the patent office ever afterward attempted to act on it. However, the American Bell Telephone Company, in 1886, soon after the decision of The Telephone Cases at the circuit, attempted to accomplish this same result, on the ground that that decision disposed of the Drawbaugh application. The matter came to the personal attention of the commissioner, who, in his reply of April 24, 1886, practically declined to acquiesce in this proposition, and suggested that an interference should be declared, reserving himself from prejudice touching such declaration if it came before him on appeal. But under the settled practice of the patent office, and the construction which that office had long given section 4904 of the Revised Statutes touching inter-

ferences, the declaration of an interference at that time clearly could not have been made. The commissioner was then new in his office, and, as his suggestion was not an order, it was not followed out. The American Bell Telephone Company, having attempted this once, and failed, may well be excused for not attempting it again.

Returning now to the second period named by the United States,— that is to say, from June 9, 1882, until the decision of the supreme court, in the spring of 1888, in The Telephone Cases, reported in 126 U. S. 1, 8 Sup. Ct. 778,—we will note at the outset that the report of the commissioner, accepted by the attorney general, to which we have already referred, reduces this period to one from October 23, 1883, to November 16, 1888; a matter of some five years. This, however, is of no consequence, except so far as it is explanatory of some other facts to which we may refer. June 9, 1882, the Drawbaugh application was still pending in the patent office. It had been rejected on the ground that the Edison carbon microphone and the Bell telephone had been in use more than two years prior to Drawbaugh's application. But Drawbaugh claimed that this public use was without his consent, and therefore did not affect him. It is also conceded by the United States, as well as claimed by the American Bell Telephone Company, that this rejection of Drawbaugh was not final, because, as said by the United States, "it was still open to him to traverse the fact, and have the question settled by public use proceeding." But it is said by the United States that the patent office could easily have disposed of Drawbaugh, because at that time the law was well settled that, under the statute of 1870, two years' public use, even without his consent, was fatal to him; and Manning v. Glue Co., 108 U. S. 462, 2 Sup. Ct. 860, is referred to as settling this point. This case was not decided until May 7, 1883. It did not involve this question; and what was said therein touching it was a dictum, and was never acquiesced in by Drawbaugh's solicitors. Whether the law can now be regarded as settled, in view of Andrews v. Hovey (decided Nov. 14, 1887) 123 U. S. 267, 8 Sup. Ct. 101, in consideration that it discusses the act of 1870, now section 4886 of the Revised Statutes, as well as the act of 1839, we need not consider. The American Bell Telephone Company was compelled, with reference to the progress of this application, to meet the practical condition of things, and we must put ourselves in that position. Therefore, whatever may now be said as to the theoretical side of the law, it is more appropriate to the purposes of this case to observe that Drawbaugh's solicitors did succeed in practically retaining his application under adjudication by the patent office, until near the close of October, 1891, as already stated.

But Drawbaugh made another difficulty, of perhaps a more serious character. The vigor and pertinacity with which the Drawbaugh application was maintained in hostility to the Bell interest went to such an extent that we may well infer from the record that even if the position of the United States, substantially to the effect that the American Bell Telephone Company is to be judged of in its performance of a legal duty according to its pecuniary ability, was sound,

it would be offset and neutralized by the financial resources, skill, and personal importance of whomsoever controlled the Drawbaugh interests. Not only was Drawbaugh pressing his own application, but it is admitted by the United States that he was opposing the issue of a patent on the Berliner microphone, on the ground of prior invention by himself, and was ready to file affidavits in support of his contention. What these affidavits would mean will appear from the fact that the Drawbaugh Case, in all its aspects, as opposed either to Bell, Edison, or Berliner, was a unit, and in either aspect involved the great bulk of the facts considered in The Telephone Cases, 126 U. S., occupying that entire volume (8 Sup. Ct. 778), and finally dividing that court by three judges in favor of Drawbaugh to only four against him. It was claimed by the United States at one point that this litigation did not involve the microphone, but, with a clear inconsistency, the United States, at another point in its argument at bar, rested one of its propositions as to the alleged duty of the commissioner at a certain crisis on the distinct ground that the circuit court had decided that Drawbaugh did not invent the microphone. The fact is that the entire dispute as between Drawbaugh, on one side, and Bell, Edison, and Berliner, on the other, turned on one and the same question, namely, the truth or falsity of Drawbaugh's story; so that, as testified to by the president of the American Bell Telephone Company, if Drawbaugh's story was substantially true, it cut up by the roots all that Edison and Berliner had done. Therefore, the affidavits which the United States say Drawbaugh was ready to file, with those in response, might be equivalent to the substance of the case found in 126 U. S. and 8 Sup. Ct. 778.

At one point in the argument the United States stated that the condition in June, 1882, was as follows:

"The examiner was refusing to issue Berliner's patent because Drawbaugh had an application pending for the same invention. He was refusing to approve Drawbaugh's claims because they were barred by public use. He could not declare an interference until that rejection was overcome, and he knew that it could not be overcome. Here was a deadlock!"

In partial explanation of this apparent deadlock, it is to be said that the practical construction of section 4904 of the Revised Statutes touching interferences, as given it by the patent office, is to the effect that no interference can be declared involving the claims embraced in any application, until those claims have been found to be patentable independently of the possible result of the interference. Therefore, the practice has been, on discovering claims apparently interfering, to hold back both applications until the patentability of each is determined, and then declare an interference. This produces very much the same result, so far as delay is concerned, as would follow if, with an ordinary bill of interpleader, no parties could be made to it, until after the right of each person sought to be made a party had been determined as against all the world except the other intended parties. By the admission of all, the course of proceedings had crystallized into that form, and the American Bell Telephone Company is not subject to just criticism if it accepted it as it found it.

In response to the solicitor of the American Bell Telephone Company the examiner wrote him on June 9, 1882:

"As at present advised, it is believed that the claims presented may be allowed; but final action in this case must be suspended in view of probable interferences with other pending applications, which will be declared as soon as possible."                :

It is admitted that the "other pending applications" included Drawbaugh. Nothing further was heard in this direction until October 8, 1883, when the solicitor having in charge the Berliner application wrote the commissioner, referring to this letter of June 9, 1882:

"Since then I have been awaiting the official action. I beg to call attention to the case, and ask that it may receive action."

The United States urge strenuously that the official record shows inaction between the dates of June 9, 1882, and October 8, 1883. The proofs of the informal proceedings show otherwise; but this is rendered of no consequence by the reply of the patent office, which came promptly within a few days, as follows:

"In response to applicant's letter filed Oct. 9, 1883, it is stated that further action in this case on the part of the office must be still further postponed, until the conditions of interfering applications will permit the declaration of interference, which seems unavoidable."

This renders unnecessary any consideration of the intervening period last referred to, because all the rules of equity require that it should, under the circumstances, be accepted as the adjudication by the United States, through the only officials to whom the respondent corporation could apply, that efforts during that period on the part of that corporation would have been unavailing. But the substantial complaint of the United States comes down to the proposition that during this period the application was suspended, and the patent held from issue, for "a single, continuous, and wholly insufficient reason." This reason is stated to be the awaiting of the decision of the Drawbaugh suit, embraced in The Telephone Cases, 126 U. S. 1, 8 Sup. Ct. 778, by virtue of an alleged agreement, to which it is said the commissioner of patents, the Bell Company, and Drawbaugh were all parties. The United States claim that this arrangement, whatever it was, was in terms an agreement, and an unlawful one. There was no allegation in the bill to this effect, nor do the proofs support it. There was undoubtedly a common understanding and a common consent. It is testified positively that the commissioner shared this common understanding, and that he personally understood the whole situation. We have already alluded to the testimony of the president of the respondent corporation to the effect that, if Drawbaugh's story was substantially true, it cut up by the roots all that Edison and Berliner had done. He also added that the quickest thing to do was to try the case in the court where it was, and that, by common consent, the Berliner application waited till the determination of that suit. The examiner at one time in charge of these conflicting applications also testified that he felt, and believed it was felt and understood by all parties, that it would be a much quicker and more satisfactory way of determining the

whole question to await the decision of the courts. He also testified that it was the tacit understanding between the office, and, as he understood, the parties in interest, that the proceedings then being had in the courts would be the best solution of the difficulty.

When this agreement, arrangement, or understanding, whatever it was, was first entered into, has not been pointed out to us; but the correspondence, to which we have already referred, between the office and the solicitor of the defendant corporation, running to October, 1883, indicates that it had not taken form at that date, or that it was understood that it was purely of an indefinite character, especially with reference to the time for which it was to run. It may also be questioned whether, when it first took form, it extended beyond awaiting the decision at the circuit. However this may have been, there is nothing in the case to show that the parties undertook to enter into an agreement. The evidence and the reason and probabilities of the thing satisfy us that whatever common consent there was to abide the result of the litigation was the consequence of the independent judgment, formed fairly and honestly,—at least by the officials of the patent office and by the representatives of the American Bell Telephone Company,—that on the whole this was the best thing to do; and the common consent consisted only in the interchange of these views. Now, can it be said that, under the circumstances, this common judgment, and the so-called "common consent" arising from it, were not wise? Before we can condemn, we must put ourselves in the position of the parties at the time, with all the surrounding difficulties, and assume to understand them better than the gentlemen concerned on either side, with the extensive practical experience which all of them possessed. But assuming that it was not wise, that, under the circumstances, the commissioner made an error of judgment, that it was his duty to have proceeded regardless of the pending litigation, and that also the American Bell Telephone Company committed an error in sharing his judgment, is this court to impose on this corporation the penalty of losing its valuable patent on that account, and give the United States, whose officers also shared in the same error, the entire benefit of the penalty? On every principle such a conclusion would be an outrage on justice, and in violation of the fundamental rules by which the law refrains from imposing punishments on parties who honestly exercise their judgments under the existing circumstances, especially circumstances of difficulty. The United States claim also that the position was changed when the decision was made at the circuit in the litigation referred to in December, 1885. In speaking of this litigation while in the circuit court, we will, for convenience, though somewhat inaccurately, describe it as "The Telephone Cases." In direct inconsistency with their proposition, made in another connection, that the microphone was not in issue in this litigation, the United States in this connection insist, as a substantial and important proposition, that it was at this time decided that Drawbaugh never invented the microphone at all. Assuming this all to be true, and that the de-

cision on appeal to the supreme court should not have been awaited, yet there can be no criticism against the American Bell Telephone Company on this score. The examiner testifies that, soon after the decision of the circuit court, its solicitor urged the passage to a patent of both the Berliner and Edison applications. The result of this was that the examiner, who testifies that he acted on his best consideration, made personally the communication to the commissioner, of April 23, 1886, to which we have already referred, asking his direction touching this request. His reply was given on April 24, 1886, to which we have also already referred, not granting the request and suggesting the declaration of an interference. This, under the law as understood at the patent office, was impracticable, as we have already explained. The American Bell Telephone Company had done all that reasonable usage required of it, and after this the case drifted along until the decision of the supreme court was announced in March, 1888, and the third period commenced, which we have already disposed of.

The events which we have recited give us another opportunity of showing the inability of the United States to furnish a practical rule by which to test the high degree of diligence which they require. On being asked what course was practicable at this period to answer their demands in this direction, they seem uncertain what method should have been adopted. The United States at one point say that the commissioner could have read the evidence in the infringement case (meaning The Telephone Cases) for himself, and decided the question of priority on the facts there shown. Of course, a request of the commissioner to do this, or to cause it to be done by any one in the office, would have been fruitless. The principal suggestion of the United States on this score was worked out at great length, and apparently with much labor, but it need be only briefly stated by us. It commences by explaining a practice of the patent office, which came into force February 6, 1883, by which, on an issue of public use, hostile affidavits cannot be filed except subject to cross-examination by the applicant. It then suggests that, on the strength of the applicability of this practice, an issue of prior invention might have been made. It is said this would not have been strictly an adversary proceeding, as it would have been solely for the information of the commissioner; that, therefore, it would have been under his control; and that, instead of permitting the examination of the mass of witnesses who testified in The Telephone Cases, the commissioner might have said to Drawbaugh, "Produce a dozen of those who know most about your invention, examine them in the presence of Berliner, and let him cross-examine them!" or, the United States say, the commissioner might have fixed a limit of time, instead of the number of witnesses, and then there would have been no excuse even for consuming more than 60 days in the investigation. But for this proposed method of proceeding the United States show no hewn path. There is no evidence in the record that any such proceeding ever took place in the patent office. It is likewise merely theoretical. The practical sum-

ming up of all these various suggestions is that the American Bell Telephone Company is in effect censured for not reforming the practice and the officials of the patent office. We think this demand is without parallel or precedent; that the case may justly be stated in this form; and that, when thus put, it shows itself so revolutionary as to require the legal mind to reject it on the mere statement.

The case has been strenuously pressed on the court as one to which should be applied the legal maxim, "Sic utere tuo ut alienum non laedas." But the attempt to apply this merely brings us back to the investigation of the same legal propositions. The United States seem to assume, as is frequently done, that this is a maxim of universal benevolence, and that the word "laedas," and the word "injure," into which it is commonly translated, are each to be used in the general sense. and not in that of the law. This is entirely a mistake. The words are used in this connection in their primary and technical sense. Literally translated, the matter relates only to injuries committed to property; but Broom's Legal Maxims, in the note to page 327, gives as its true substantive meaning, "So use your own property as not to injure the rights of another;" and in the text he states the general rule to the same effect. He sums up his discussion touching this maxim by laying down the principle that one must use and enjoy his own property so as "not to affect injuriously the rights of his fellow subjects." He also says, in the same summing up, that, where rights conflict, we must consider whether their exercise is not restrained by the existence of some duty; "and," he continues, "whether such duty be or be not imposed, must be determined by reference to abstract rules and principles of law." So it is plain that no attempt to apply this maxim would relieve us from the necessity of doing what we have already done; that is to say, from ascertaining from sources outside of the maxim what obligations the law imposed on the American Bell Telephone Company under the circumstances of this case.

We have thus shown, by testing at various points, that the United States give no practical rule for measuring in this case the obligation demanded by them; that is to say, "an extraordinary duty, which could be discharged only by the greatest possible diligence in the prosecution of the application." Therefore, if there was any such obligation, the United States have failed to meet the burden resting on them of proving that any lack of compliance with it had any practical result in producing the delays complained of. It would, indeed, be quite plausible to declare that the American Bell Telephone Company, with all its resources, could have found some way to break the deadlock if it had earnestly desired so to do. This is, in fact, what the United States say. Perhaps this is true. But the courts have never yet been vested with authority to deprive any person or corporation of property or rights on the strength of any such mere assertion, nor without allegations and proofs in a definite and practical form. The lack of these, under the circumstances we have explained, aids the proposition that

there is no such obligation, as claimed by the United States. There is no precedent brought forward by the United States to support their position, nor has this court found any, either in this department of the law or in any other. Nor does the proposition of the United States rest on any principle which can be supported by authority from any quarter; or by any method of reasoning which connects it with any fundamental legal doctrine. By granting a patent for a meritorious invention the United States parts with nothing which it before had, but only recognizes and supports for a limited period the equitable title of the patentee. We think this is the first instance in which either the people or the king, wherever the common law prevails, has sought to revoke by legal proceedings, on the ground of imputed or merely legal fraud, a grant of this character, issued to a subject after full official knowledge of all the facts, where there has been no deceit, collusion, or corruption, and where the subject duly complied with all statutory and departmental requirements, merely because the officers in charge have been dilatory, and the subject failed to use zeal in spurring them on. The law goes quite far enough in protecting the state against the acts and omissions of its agents, without our pushing it to the extreme of adopting this heretofore unheard-of proposition. We do not, however, intend to have it inferred that we have determined that the law requires any degree of diligence beyond a compliance with statutory provisions, official regulations, and the formal demands from time to time of the public officials charged with duties under the patent law. We do not determine that any degree of laches whatever will forfeit a patent once granted, reserving, of course, cases of abandonment, and other cases where, through laches, the equities of strangers have become established, neither of which classes are involved in the suit at bar. Congress, in sections 4894 and 4904 of the Revised Statutes, established certain fixed periods for giving progress to applications for patents, which the supreme court has so far recognized by analogy as to apply the limitation to a bill in equity filed under section 4915 of the Revised Statutes. Gandy v. Marble, 122 U. S. 432, 7 Sup. Ct. 1290. The United States ask us to establish a period of limitations other than fixed by statute, and we do not decide that, under any circumstances, we have any authority so to do. We merely determine that the case of extreme diligence, as made by the United States, cannot be maintained.

While the delay in this case was unusual, it was not u...cedented. We have referred to Smith v. Vulcanite Co., 93 U. S. 486, where the patent was granted nearly 9 years after the application was filed, and nearly 12 years after the caveat was deposited in the patent office. The appellants have shown from the record that, during the two years of 1893 and 1894, 49 patents issued, with an average of 10 years after the applications were filed, 10 of them 10 years or over, and several of them 14 years or over; and they well observe that the number of these long-pending cases is enough to show that something in the patent-office system produces them. Although the case shows that the applications of commissioners

to congress have been fruitless for relief, yet, so far as we can discover, the executive departments must still turn for that purpose in that direction, and not to the courts.

The second ground of complaint of the United States is stated in the following language:

"On September 3, 1880, Berliner filed an application which professed to be a division of his application of June 4, 1887, on which division a patent was granted November 2, 1880, numbered 233,969, which patent was assigned to the Bell Company on April 1, 1881. It is alleged in the bill that this patent covers the invention described and claimed in the patent in suit No. 463,569, and that it exhausted the authority of the commissioner in respect to that invention, and that the commissioner was therefore without jurisdiction to issue the subsequent patent."

At the bar the United States rested on this point on Miller v. Manufacturing Co., 151 U. S. 186, 14 Sup. Ct. 310, already referred to. The principle of this decision is evident, and was stated as early as 1865, in Suffolk Co. v. Hayden, 3 Wall. 315; and it appears from the record that it was recognized by the patent office before Miller v. Manufacturing Co. was decided. We may remark that the facts in the case at bar on their face are not like those of Miller v. Manufacturing Co., as here the two patents claimed to interfere were not issued to the same applicant; and the acquirement, after it issued, by the American Bell Telephone Company of the Berliner patent of November 2, 1880, would not necessarily estop the assignee. Nevertheless, as this point is not made in the answer, it may be that the case raises an estoppel, of which the parties were aware, not brought to the attention of the court. Therefore, we are compelled to investigate this question independently of this suggestion. This statement of the issue renders it unnecessary to refer to the pleadings, except to so much of the answer of the American Bell Telephone Company as alleges that the question now raised by the United States was, in the progress of the application for the patent for the Berliner microphone, made the subject of special consideration by the examiner and the board of examiners in chief. The examiner on this point decided against the American Bell Telephone Company, as assignee of Berliner, but the board reversed the examiner; so that, in consequence thereof, the patent now in dispute was duly and formally issued. The examiner and the board had before them all the facts bearing on this branch of the case which we now have, and understood the law as stated anew in Miller v. Manufacturing Co.; so that the patent was issued under no mistake of either law or fact. The most that can be claimed by the United States is that the officials of the patent office, having all the law and facts before them, erred in the exercise of their free judgment in the determination that the earlier patent did not cover the invention described and claimed in the later one. Even were this so, the result was not a mistake in the sense of the law in its application to the cancellation of deeds and other instruments; but it was merely an erroneous determination of the ultimate fact deduced from the primary facts, all of which were known. As we are clear that this proposition of the United States cannot be sustained on the law, even admitting the facts to be as claimed,

we will not undertake to determine the question of the substantial identity of the respective claims of the two patents, or any of them. We prefer to leave that without prejudice, in the event it hereafter involves other individual or corporate rights.

As we have already said, U. S. v. American Bell Tel. Co., 128 U. S. 315, 9 Sup. Ct. 90, came before the court as a pure case of intentional, positive fraud, and the court there was careful to say, on pages 355 and 356, 128 U. S., and page 90, 9 Sup. Ct., as follows:

"It may be possible that a patent would not be absolutely void where the patentee was not really the first inventor, and the act of congress made provision that any man sued for an infringement of such patent might prove that the patentee was not the original discoverer or inventor. But we do not decide here whether a patent is absolutely void because the patentee is not the first inventor, nor whether a court of equity should set aside a patent where the party had obtained it without fraud or deceit, believing himself to be the first inventor. It is sufficient for the present case, in which, on demurrer, we wish to decide nothing more than is necessary to determine whether the defendants should be called to answer the bill, to say that the charge here is that he knew he was not the first inventor, and that his efforts to procure the patent were fraudulent, because he was aware that he was obtaining a patent to which he was not in law or equity entitled."

Therefore, it must be said that U. S. v. American Bell Tel. Co. does not in terms reach the case at bar. Nevertheless, the principles underlying the assumption of jurisdiction in that case, coupled with other decisions of the supreme court, especially those touching bills in equity to set aside patents under the land laws of the United States (U. S. v. San Jacinto Tin Co., 125 U. S. 273, 285, 8 Sup. Ct. 850), seem to support jurisdiction on the same basis which supports the ordinary bill in equity brought to cancel an instrument obtained through fraud, accident, or mistake, and to give the United States the same broad relief which would be given to an individual. In reference to this proposition, we agree with the United States that a bill of this nature would lie in a case of "mistake," as that word is properly understood in the branch of the law touching this topic, except so far as the peculiar provisions of the patent statutes may limit the general rule. We are also clear that such a bill would lie where there was a clear exercise of excess of power, still using these terms in the proper sense as relating to this branch of jurisdiction.

It is hardly claimed that the circumstances of the case at bar show "mistake" in the proper sense of the word in this connection, and the facts to which we have referred make clear that such a proposition could not be maintained if made. Ordinarily, the mistake which the equity courts relieve is something substantially different from mere error of judgment, based on full knowledge of the facts and law; and, although there may be exceptional cases arising from extreme circumstances, it could not be claimed that this is one of them. The main question, therefore, is whether the issuing of the second patent to the same applicant for the same invention, under such circumstances that it was not clearly manifest the inventions were the same, and that there might be a reasonable difference of opinion on the point of identity, involved, in the view of the

statutes touching patents, such an excess of power as would justify a court in equity in rescinding the second patent thus issued. We cannot put the case more strongly than this in favor of the United States, because, at the best, it must be admitted by the United States that there is a reasonable doubt on the point of identity. It will be seen that this question opens a broad field, because if this court can be called on in equity, on the suggestion of the United States, to rescind a patent merely on this ground, it may in the same way be required to investigate every question which lies behind the issue of a patent, including those of novelty, usefulness, public use, and anticipation. The distinction which the United States seek to make between the case at bar and cases which might involve the other issues, as of novelty, usefulness, public use, and anticipation, are clearly not well founded. Some extreme supposed examples which the counsel put do not help in sustaining these distinctions, but only illustrate the fact, which must be freely admitted, that, with reference to any of these various topics, there may be such exceptional cases as to show a clear error, within the meaning of this branch of the law, thus involving an excess of power. Such examples, for instance, as that of the commissioner issuing two patents to the same applicant in identically the same terms, are easily disposed of without involving any general principles.

We are satisfied that the statutory provisions touching the patent office are sui generis, and contain in themselves peculiarities, which render inapplicable certain rules and decisions otherwise of an analogous character. This fact is well noted in Orchard v. Alexander, 157 U. S. 372, 385, 386, 15 Sup. Ct. 635. Section 4911 of the Revised Statutes provides that if an applicant, except a party to an interference, is dissatisfied with the decision of the commissioner, he may appeal to the supreme court of the District of Columbia; and section 4914 provides that the decision of that court shall govern the further proceedings in the case. Section 4915 also provides that if the patent is refused, either by the commissioner or by the supreme court of the District of Columbia, the applicant may have remedy by a bill in equity, the details of which need not be further explained, except to say that, as we have already said, it was decided in Gandy v. Marble, 122 U. S. 432, 7 Sup. Ct. 1290, the two-years limitation found in section 4894 applies to it. There can be no question that the special and summary appeals thus provided for in behalf of an applicant for a patent reach the case where a second patent is refused, for the reason which, it is claimed in this case, renders the patent in issue void. Butterworth v. Hoe, 112 U. S. 50, 63, 5 Sup. Ct. 25. The statute thus gives the applicant a remedy of a special and summary character, which he can avail himself of when all the facts are fresh and the parties cognizant of them are at hand. Of course, fraud always vitiates, and every special remedy is subject to that general rule; but to assume in this case jurisdiction to annul this patent for the reason we are now considering is to deprive applicants for patents of resort to the special tribunal, under special circumstances, given them by the statute.

This we have no right to do, even though the same statute has not given the United States the same summary appeal. The proceedings in the supreme court of the District of Columbia are between the United States and the applicant, and, by express provision, do not preclude individuals interested to contest a patent. Those under section 4915 have a like limited effect, although they may extend so far as to bar a person holding an alleged interfering patent. Thus, congress has established a special system, ending in a judicial determination, for the purpose of deciding, as between the applicant and the United States, the very issue now before us. We cannot disregard the implied command of the law that we shall not interfere, by any general rules of jurisprudence, with special rights thus expressly provided for. Orchard v. Alexander, already referred to, on pages 385 and 386, 157 U. S., and page 635, 15 Sup. Ct., recognizes this principle, in that it substantially declares that the statute provision to which we have just referred deprives the secretary of the interior of the jurisdiction with reference to the patent office which he possesses with reference to proceedings in the general land office; and, by parity of reasoning, the same provisions likewise clip our jurisdiction.

A further examination of the statute brings out even a more positive conclusion touching this issue. Section 4916 of the Revised Statutes, touching reissues, provides that "whenever any patent is inoperative or invalid," for the reasons therein stated, "the commissioner shall * * * cause a new patent * * * to be issued to the patentee," and so on. By the frame of this statute, the jurisdiction of the commissioner depends nominally on the fact that the patent is inoperative or invalid. As against alleged infringers, and as between alleged interfering patents, the statute has been strictly construed, so far as the powers of the commissioner are concerned, although we are not aware that any issue touching them has arisen as between the United States and a patentee. The expressions cited by the United States from Seymour v. Osborne, 11 Wall. 516, 545, even if applicable to a suit in behalf of the United States, may well be understood to rest on the peculiar form of this section in this particular. But section 4893, authorizing the original issue of patents, is framed in an entirely different manner, and reads:

"On the filing of any such application and the payment of the fees required by law, the commissioner of patents shall cause an examination to be made of the alleged new invention or discovery; and if, on such examination, it shall appear that the claimant is justly entitled to a patent under the law, and that the same is sufficiently useful and important, the commissioner shall issue a patent therefor."

The language is quite positive in making the power of the commissioner to issue a patent dependent on the result of his own examination; that is, on facts as he finds them, and not on facts as they actually exist. Therefore, it is not easy to understand how the determination and act of the commissioner in issuing any patent which, on examination as required by that section, seems to him to be suitable to be issued, can be ultra vires, though, as already said, there may be cases of such glaring error appearing on the face of the transaction as to be exceptional and outside of the ordinary rule.

In several late cases the nature and effect of the determinations of the commissioner based on this section have been stated by the supreme court, although not in such connection as to directly settle the question we are now considering. In Morgan v. Daniels, 153 U. S. 120, 124, 14 Sup. Ct. 772 (a bill in equity resting on section 4915, to which we have already referred), the court said that even a proceeding of that nature, expressly authorized by statute, was an application to the court to set aside the action of one of the executive departments; so that the proceeding was "something in the nature of a suit to set aside a judgment." In Orchard v. Alexander, the court said, on pages 378 and 379, 157 U. S., and page 635, 15 Sup. Ct., that, although the action of a department in a matter of this nature was executive, at the most only quasi judicial, and not a purely judicial act, yet such a determination may be made by statute final and conclusive. In Boyd v. Hay-Tool Co., 158 U. S. 260, 261, 15 Sup. Ct. 837, the court applied these principles to the question of the identity of different patents issued by the patent office. In none of these cases were the United States a party, and expressions of this character cannot always safely be exchanged from opinions filed in suits between individuals to suits of the character at bar, and the reverse; yet they all indicate generally the nature of a finding of the commissioner of patents as the result of the examination which the statute provides shall be made by him.

In land grant cases to which the United States have been a party, the rule has been laid down in the broadest and strongest terms. In U. S. v. Marshall Silver Min. Co., 129 U. S. 579, 588, 9 Sup. Ct. 343, the court, referring to the officials of the land department, said as follows:

"If the officers of that department of the government have acted within the general scope of their power, and without fraud, the patent which has issued after such proceedings must remain a valid instrument, and the court will not interfere, unless there is such a gross mistake or violation of the law which confers their authority, as to demand a cancellation of the instrument."

In U. S. v. California & O. Land Co., 148 U. S. 31, 43, 13 Sup. Ct. 458, the court fully reaffirmed this statement of the law. In Catholic Bishop of Nesqually v. Gibbon, 158 U. S. 155, 15 Sup. Ct. 779, the court finally laid down the broad rule that, "in the administration of the public lands, the decision of the land department upon questions of fact is conclusive, and only questions of law are reviewable by the courts." That the court intended this to cover issues between the United States and patentees is plain, because it cited in support of this proposition numerous cases of that character; and we use these expressions so far only as they touch that class of issues.

We have shown that the action of the commissioner, so far as this issue we are now considering is concerned, was merely a finding of the ultimate facts from other facts, all of which were known to the officials, and was therefore part of the ordinary work of the office, and the principle which we thus use in the interpretation of section 4893 is one of very general application. It is illustrated in numerous departments of the law, where acts are done by public or corporate

officials, as the result of investigations authorized to be made by themselves, none more noticeable than in the great mass of municipal and other public bonds which have been supported by the courts on the strength of the certificates of local officers, directed to make findings of the preliminary conditions required by statute. We think its application to this case makes it clear that, with the possible extreme exceptions which we have characterized, the statute vests in the commissioner of patents authority to issue all such patents as on examination he deems proper to issue; that none thus issued are issued ultra vires; that all such are within the scope of his powers, within the meaning of the expressions we have cited from the supreme court; and that there is nothing in this case which excepts it from this general rule. But we have pursued the matter already further than was necessary. It is clear, on this part of the case, that we are barred from taking jurisdiction by reason of the statute provisions which give special remedies to an applicant whose patent is refused, and, passing by this, that also the issue of this patent was within the scope of the authority of the commissioner; and no mistake being proven, and no other equitable ground appearing, we cannot revise his action in this suit.

The United States have filed a motion in this court praying that, if we find for the appellants, we will reserve leave to the circuit court to permit an amendment at bar, alleging that the American Bell Telephone Company did directly agree with the representatives of the Drawbaugh application that the determination by the patent office of the question of priority should abide the decision in The Telephone Cases; that these parties, acting in concert, did procure the commissioner of patents to consent to such postponement; and that thus the American Bell Telephone Company, by its own act, procured the postponement of the decision of priority, without necessity or right, in violation of its duty to speed the patent for the microphone. We have already found that, as the record now stands, it contains no proof to sustain an allegation of this character. Therefore, an amendment of this nature would require the opening of the record below for further proofs. It is not at all a case where a complainant has proved his case, but his allegations are found by the appellate court to be inapt. To grant this motion would, under the circumstances, violate all the rules requiring diligence from parties complainant.

The decree of the circuit court is reversed, and the case remanded to that court, with directions to dismiss the bill.